**CHARLES YEAGER, Appellant, v. HARRAH'S CLUB, INC., and HOLIDAY CORP., Respondents.**

No. 23595

June 27, 1995

897 P.2d 1093

*Hamilton & Lynch,* Reno, for Appellant.

*Vargas & Bartlett* and *Debra B. Robinson,* Reno, for Respondents.

## OPINION

By the Court, ROSE, J.:

This action commenced in the district court after appellant Charles Yeager (Yeager) was terminated from his employment by respondent Harrah's Club (Harrah's). The district court granted summary judgment in favor of Harrah's against all of Yeager's claims because Yeager failed to overcome the presumption that he was employed at-will. For reasons discussed hereafter, we conclude that Yeager has failed to raise genuine issues of material fact concerning his status as an at-will employee; therefore, we affirm the lower court's order of summary judgment.

### FACTS

Yeager began working for Harrah's as a cashier during the summer of 1965. During the next twenty-one years, Yeager progressed through the ranks, ultimately becoming the assistant general manager of operations. Sometime in early 1986, Holiday Corp.[1] began a restructuring of the organization. As a result, Yeager's position and nine other key casino executive positions were eliminated. Consequently, Yeager and the nine other executives were terminated on July 29, 1986.

Almost two years later, Yeager filed a complaint in the district court in which he joined Harrah's and Holiday Corp. as defendants. Yeager's complaint set forth nine causes of action: (1) breach of an employment contract; (2) tortious breach of the covenant of good faith and fair dealing; (3) slander; (4) negligence; (5) conspiracy; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; (8) invasion of privacy—public disclosure of private facts; and (9) invasion of privacy—false light.

---

[1] Holiday Corp. owns 100% of the stock of Holiday Inns, Inc., which in turn owns 100% of the stock of Harrah's Club, thereby making Harrah's Club a wholly-owned subsidiary of Holiday Corp.

Yeager alleged that he had an implied contract for continued employment arising from: (1) verbal promises made at the outset of his employment relationship and continuously thereafter for twenty-one years; (2) written promises contained in the employee handbook that Yeager was required to read and acknowledge at the outset of his employment relationship; and (3) Harrah's demonstrated policy of not terminating employees, including supervisory personnel, except for cause, which policy Yeager himself was required to follow as a supervisor. To buttress these assertions, Yeager provided the district court with the sworn affidavits of former co-workers James Caselli and Barney Mozingo. Mr. Caselli was employed at Harrah's Reno from 1958 until 1986. Mr. Mozingo was employed at Harrah's Reno for many years commencing in 1973. Both affiants' employment careers overlapped with the career of Charles Yeager.[2]

In response to Yeager's complaint, the respondents filed a joint answer denying all of the claims made by Yeager. Additionally, the respondents moved the district court for summary judgment pursuant to NRCP 56(b). They asserted that Yeager was merely an employee at-will, and was, therefore, subject to termination without cause as a matter of law.

Following a hearing on the summary judgment motion, the district court concluded that Yeager failed to overcome the presumption that he was employed at-will, and granted summary judgment in favor of the respondents. The district court further concluded that since Yeager's tortious claims were dependent upon the existence of a contract for continued employment, summary judgment should be granted on them as well. This appeal followed.

## LEGAL DISCUSSION

This court's review of a summary judgment order is de novo. Tore, Ltd. v. Church, 105 Nev. 183, 185, 772 P.2d 1281, 1282 (1989). Where a motion for summary judgment under NRCP 56(c) has been granted, the essential question on appeal is whether genuine issues of material fact were created by pleadings and proof offered. Copeland v. Desert Inn Hotel, 99 Nev. 823, 673 P.2d 490 (1983). We are cognizant, however, that conclusory statements along with general allegations do not create an issue of fact. Michaels v. Sudeck, 107 Nev. 332, 334, 810 P.2d 1212, 1213 (1991). The resolution of this case turns on whether Yeager

---

[2]In virtually identical affidavits, Caselli and Mozingo declared that it was widely understood and accepted among Harrah's employees that an employee could only be terminated for cause.

provided the district court with sufficient evidence to overcome the presumption that he was employed at-will. The at-will presumption is not enumerated under NRS 47.250[3] as a disputable presumption. This court has held, however, that NRS 47.250 is illustrative and not exclusive. Privette v. Faulkner, 92 Nev. 353, 357, 550 P.2d 404, 406 (1976).

This court has consistently applied an employment at-will presumption in wrongful termination disputes. Vancheri v. GNLV Corp., 105 Nev. 417, 420, 777 P.2d 366, 368 (1989); *see also* Smith v. Cladianos, 104 Nev. 67, 68, 752 P.2d 233, 234 (1988); K Mart Corp. v. Ponsock, 103 Nev. 39, 42, 732 P.2d 1364, 1366 (1987). A presumption not only fixes the burden of going forward with evidence, but it also shifts the burden of proof. NRS 47.180(1); *Vancheri*, 105 Nev. at 421, 777 P.2d at 368. Generally, an at-will employment contract can be terminated whenever and for whatever cause by an employer without liability for wrongful discharge if the employment is not for a definite period and if there are no contractual or statutory restrictions on the right of discharge. *Smith*, 104 Nev. at 68, 752 P.2d at 234.

## Oral Promises of Continued Employment

Yeager maintains that he has presented evidence to the district court that supports the existence of an implied contract and rebuts the at-will presumption. In support of this proposition, Yeager posits two arguments. First, Yeager claims that he was repeatedly promised that his employment would continue until retirement unless he was terminated for cause.[4] Secondly, he asserts that

---

[3]NRS 47.250 lists 21 disputable presumptions. These presumptions impose on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence. NRS 47.180.

[4]In Yeager's deposition, the following dialogue took place:

Q You didn't have an employment contract, did you?

A No. A written contract, no.

Q Did anyone promise you that you would have a job for a certain number of years?

A Rome Andriotti said several times to me that I'd be at Harrah's until I retired . . . .

Q Other than saying that you had an opportunity to advance, did anyone tell you that you had lifetime employment?

A He did, Bill Harrah did, Bob Contois, Mert Smith, unless I did something wrong to jeopardize that, where I would be terminated if I stole, or something like that.

. . . .

Q But did anyone promise that you would be there permanently?

written promises of continued employment were made in the employee handbook.

Yeager's assertion that oral promises were made to him are uncorroborated,[5] but must be accepted as true in resolving a motion for summary judgment against him. Thus, we must resolve whether an employee's uncorroborated assertions that oral promises were made assuring his continued employment are enough to overcome the presumption of at-will employment.

This is a matter of first impression in Nevada. However, other jurisdictions have addressed the conflict between oral representations of long-term employment and the employment at-will presumption. In Virginia, "mere oral promises or assurances of job security are insufficient to rebut an at will presumption." Sullivan v. Snap-On Tools Corp., 708 F. Supp. 750, 751 (E.D. Va. 1989) (citing Addison v. Amalgamated Clothing and Textile Workers, 372 S.E.2d 403, 405 (Va. 1988)), aff'd, 896 F.2d 547 (4th Cir. 1990). In Utah, "general assurances of an ongoing working relationship are not sufficiently definite so as to rebut the at-will presumption." Evans v. GTE Health Systems, Inc., 857 P.2d 974, 977 (Utah Ct. App. 1993), aff'd, 878 P.2d 1153 (Utah 1994). In Washington, an employee remained an at-will employee despite repeated oral promises that he would retain a supervisory position as long as job performance met a certain level; such promises were "not sufficient to create an issue of material fact as to the existence of an enforceable promise of continued employment in a specific job." Lawson v. Boeing Co., 792 P.2d 545, 548 (Wash. Ct. App. 1990), review denied, 811 P.2d 219 (Wash. 1991); see also Smoot v. Boise Cascade Corp., 942 F.2d 1408, 1410-11 (9th Cir. 1991).

Other courts examine whether the alleged oral contract was supported by consideration. Maietta v. United Parcel Service,

---

A  I considered that a promise, when—if you didn't get out of line and did your job.
. . . .
Q  Are there any documents that you rely on that you believe promised you lifetime employment?
A  Possibly when I first came to work there in the original handbook, because it stated that you had to do certain things to be terminated or you would have a lifetime career there and possibility of advancement.

[5]Yeager did not offer to the district court the affidavit of anyone, other than himself, who heard these alleged promises being made, nor did he offer the affidavit of any person who made such an offer.

Inc., 749 F. Supp. 1344 (D.N.J. 1990), *aff'd*, 932 F.2d 960 (3d Cir. 1991) (oral representation made to employee that he would not be fired except for cause did not convert his at-will employment into an employment contract providing for termination only for just cause, absent evidence that the alleged representation was made to induce employee to reject a specific job offer); Alter v. Resorts Int'l, Inc., 560 A.2d 1290 (N.J. Super. Ct. Ch. Div. 1989) (alleged lifetime contract between casino operator and former employee lacked consideration additional to services incident to employment, and thus was not enforceable). Another court examined whether the oral representation was specific enough to constitute an offer. Goodkind v. University of Minnesota, 417 N.W.2d 636 (Minn. 1988) (an employer's general statements of policy do not meet the contractual requirements for an offer).

Essentially, Yeager wants this court to find that a contract for long-term employment existed based merely on his uncorroborated assertions that oral promises were made to him. However, if an employee could overcome the presumption of at-will employment merely by asserting that uncorroborated promises were made, then obituaries for the presumption should be written. Other than Yeager's self-serving assertions, the record is bereft of any evidence that Harrah's entered into a long-term employment contract with Yeager.

The dissent claims that we are imposing special restrictions on an employee who is making a wrongful termination claim. In a sense we are, and it is because we must define the quantum of evidence necessary to overcome the presumption of at-will employment. In doing this, we must balance conflicting principles, the unfettered right to sue against the continued viability of the employment at-will presumption, and the special interests of both employer and employee. We are not dealing just with a contractual cause of action but with one that squarely clashes with the employee at-will presumption that is part of Nevada law. Our responsibility is to state, in a case-by-case basis, what evidence is sufficient to overcome the presumption. This supporting evidence to overcome the employment at-will presumption can take a variety of forms, the employer's handbook or correspondence, the employer's personnel practices or witnesses to the specific employment contract. None of these types of evidence supports the employee's claim in this case as we explain.

This case is not the first time we have denied a worker's claim that he was a for cause employee because he did not produce corroborating evidence. In Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989), we stated:

> Vancheri testified that it was his "understanding" that the

employment was for a fixed period. He failed, however, to offer any independent evidence indicating the terms of an employment contract.

*Id.* at 421, 777 P.2d at 369. The dissent's claim that we are establishing a corroboration requirement for the first time is simply in error.

In short, an employee alleging the existence of a long-term employment contract must supply some corroboration that a contract has been formed specifically with that employee. Uncorroborated assertions, alone, do not overcome the presumption of at-will employment.

*Written Promises of Continued Employment*

Next, Yeager argues that written promises in the employee handbook converted his employment status into termination only for cause.[6] The employee handbook lists some general guidelines of personnel policy[7] and twenty-three modes of conduct that will absolutely result in dismissal. Among the prohibited behaviors listed are drunkenness, lewdness, fighting, and theft. From this, Yeager concludes that he could not be terminated unless he performed one of these proscribed modes of conduct. We disagree.

Nothing in the handbook states that the twenty-three listed infractions are the exclusive causes for termination, nor does the handbook say that an employee will not be terminated on other grounds or for no reason at all. For example, why would Harrah's foreclose on its ability to hire and fire employees as the gaming markets expand and contract? Yeager's conclusion sug-

---

[6] At the commencement of his employment, Yeager was given a copy of the employee handbook, entitled *You and Your Job*. The person assigned to train Yeager was required to make sure that Yeager had read and understood this handbook.

[7] In addition to a section entitled **ACTIONS RESULTING IN DISMISSAL,** the employee handbook states Harrah's personnel policy, in relevant part:

**PERSONNEL POLICY**

. . . .

All of us here [at Harrah's] are pledged to the following personnel program:

. . . .

2. Fair treatment for each member of the organization from his supervisors and his fellow workers.
3. Maximum security of employment for everyone whose work is satisfactory.

gests that when market forces contract, Harrah's has to remain at full employment because market contraction is not among the listed causes for termination. It is doubtful that Harrah's would intend this result by listing certain proscribed conduct in an employee handbook. It is more plausible that Harrah's merely intended the handbook to be a guideline for employees to measure their conduct against.

In support of his argument, Yeager relies on this court's holding in D'Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206 (1991). In *D'Angelo*, the defendant, GEMCO, terminated D'Angelo for selling outdated film at a discount price without permission. The GEMCO employees' handbook contained a rule prohibiting unauthorized discounts to anyone without permission. The handbook also included a clause providing that any discharge for failing to do work as required had to be preceded by a written notice to the employee. D'Angelo was dismissed without notice. In a letter to the labor commissioner, GEMCO stated, "As noted in the Handbook, which Mr. D'Angelo has read and acknowledged understanding of, deviation from this rule is considered most serious by the company and proper cause for discharge." *Id.* at 709, 819 P.2d at 210. This court held that there was a triable issue of fact because:

> GEMCO's reference to the handbook, the proclaimed "understanding" of the parties relative to the handbook, and GEMCO's reference to a rule violation taken from the handbook as being the cause of D'Angelo's dismissal, all tend to lead to the conclusion that the employment relationship was defined by the handbook and that both parties considered themselves bound by the handbook with reference to termination rights and processes.

*Id.*

While *D'Angelo* stands for the proposition that, under certain circumstances, an employee handbook can be incorporated into the employment agreement, it is not dispositive of the instant case. Unlike *D'Angelo*, Harrah's did not terminate Yeager for any of the twenty-three proscribed modes of conduct listed in the employee handbook. Instead, Yeager was dismissed because of corporate restructuring and because his duties duplicated those of another employee.

Yeager also relies on American Bank Stationery v. Farmer, 106 Nev. 698, 799 P.2d 1100 (1990). In *Farmer*, this court concluded that an employee handbook rebutted the presumption that Farmer was an at-will employee because the handbook specifically said that an employee could only be terminated for cause. *Id.* at 702, 799 P.2d at 1102. The instant case is easily distinguishable from *Farmer* because Harrah's employee handbook does not proclaim

that an employee can only be terminated for cause. Moreover, in *Farmer* this court also stated: "We emphasize that this opinion does not stand for the proposition that an employee handbook explaining a company's policies regarding termination automatically transforms an at-will employee into an employee who may only be fired for cause. Such a holding could discourage companies from publishing such handbooks." *Id.* at 703, 799 P.2d at 1102.

Finally, in *D'Angelo* this court declared: "Just as there are cases in which handbooks and employment practices can be found to support an express or implied obligation of continued employment, so are there cases in which such an obligation is absent as a matter of law." *D'Angelo*, 107 Nev. at 710, 819 P.2d at 210. The instant case falls among the latter.

## CONCLUSION

We conclude that nothing in the record, other than Yeager's own statements, substantiates the allegation that Yeager had a contract for continued employment. Likewise, Yeager's tort claims fail for lack of a contract for continued employment and because Harrah's did not commit any acts that offend Nevada's public policy. Accordingly, we affirm the district court's order of summary judgment.

STEFFEN, C. J., YOUNG and SHEARING, JJ., concur.

SPRINGER, J., dissenting:

It is the established employment law in this state that the at-will presumption may be rebutted by an employee's showing that "there was an express or implied contract between his employer and himself that his employer would fire him only for cause." American Bank Stationery v. Farmer, 106 Nev. 698, 701, 799 P.2d 1100, 1102 (1990). Today this court places an unprecedented and unwarranted impediment in the way of wrongfully discharged employees who seek to enforce their contractual rights to continued employment. Employees who set out to prove the existence of express or implied contracts with their employers in the future will henceforth be put to an added burden of proof and must "supply some corroboration that a contract has been formed."

The majority opinion places employment contracts into a category of their own and imposes special, added restrictions and requirements of proof upon workers. The majority does not, and cannot, give a reason why employment contracts should not be treated like any other contracts or why workers should have the added burden of furnishing corroboration in order to establish their contractual rights.

"[A]n employer may expressly or impliedly agree with an employee that employment is to be for an indefinite term and may be terminated only for cause . . . ." D'Angelo v. Gardner, 107 Nev. 704, 712, 819 P.2d 206, 211 (1991). "We have called this a contract of 'continued employment,' a contract which an employee can enforce in accordance with its terms." *Id.* It used to be, before the filing of this opinion, that an employee, like any other contract litigant, could prove a case in contract simply by testifying under oath that a certain agreement had been entered into. Before this case was decided, workers were competent to take the witness stand and establish, on their own, without corroboration, their contractual rights, by testifying under oath that their employer had contracted with them that they would not be dismissed unless they failed in some way to perform the duties of employment. The trier of fact was free to accept or reject a worker's testimony on face value. Now things are different. Workers now go into a contract action against their employers at a considerable disadvantage—they must, unlike all other plaintiffs in contract actions, furnish *corroboration* of their own sworn testimony.

"The testimony of a witness is said to be corroborated when it is shown to correspond with the representation of some other witnesses, or to comport with some facts otherwise known or established."[1] Now, in order for a worker to prevail in an employment contract lawsuit against an employer, the worker must be able to furnish "some other witness" who was present when the contract was entered into or must produce evidence of "known or established facts" which "correspond" to the worker's testimony. Mr. Yeager, the employee in the present case, did not, of course, have any way of knowing when he filed his lawsuit that this court was going to impose this extra burden of proof upon him, based solely upon his status as an employee. Mr. Yeager obviously had no way of knowing that he was not going to be considered competent to pursue a contract action against his employer unless he was able to bolster his own, sworn testimony with some kind of corroborating evidence. Mr. Yeager had no reason to suspect that this court would impose this handicap on contract claimants who also happen to be employees; and it does not seem fair to me that he should lose his day in court because of a newly-instituted requirement of proof that was imposed upon him *after* he filed suit. At the very least, this case should be remanded in order to give Mr. Yeager an opportunity to present any corroboration that he might have.

Yeager was hired by Harrah's Club, Inc. almost thirty years

---

[1]Black's Law Dictionary 311 (5th ed. 1979).

ago. He testified under oath that representations were made to him by corporation executives, at the time of his hiring, that his "employment would only be terminated for cause."[2] He also testified that at the time he was employed, it was the policy of Harrah's, instituted by then president of Harrah's, William Harrah, not to hire people on an "at-will" basis but, rather, as employees who would "only be terminated for cause." He further testified that Harrah's had "agreed" and that it was "understood by the employees and by the management" that he was a "part of Harrah's that, unlike other casinos in town" had a "policy" which "provided that people who were hired at Harrah's casino were hired as career employees who would be retained and who would not be terminated except for specifically .enumerated cause, pursuant to the policies set forth in Harrah's handbook."

Yeager advances a very strong and coherent case for the existence of a contract of continued employment. In accordance with Harrah's employment policies at the time Yeager was employed, there was an exchange of promises between Harrah's management and Yeager that could be accepted by a fact finder as creating a contract of continued employment, a contract that protected Yeager from arbitrary dismissal and required that Harrah's dismiss him only if he "did something wrong to jeopardize" his job. (*See* footnote 2.)

I strongly disagree with the harsh and discriminatory "corroboration" rule that this court now imposes on workers who sue their employers in contract actions. Further, it is clear to me that, irrespective of the corroboration rule, Mr. Yeager has made out a *prima facie* case and is entitled to his day in court. I would reverse the summary judgment.

Given the wording of the employees' handbook and the nature of Harrah's Club employment policies that were in place some thirty years ago, I consider it quite probable that a fact finder would conclude that Yeager, and other employees hired at the time he was, were in fact hired under a contract of continued

---

[2]On cross-examination by Harrah's attorney, Yeager was asked: "Did anyone promise you that you would have a job for a certain number of years?" Yeager, of course, never claimed that his employment contract was for a "certain number of years"; nonetheless, he responded to the question by saying that certain, named persons in managerial positions had made definite promises to him. "Rome Andreotti said several times to me that I'd be at Harrah's until I retired . . . ." William Harrah, Bob Contois and Mert Smith, all in high managerial positions, had told Yeager that he had "lifetime employment" and that "unless [he] did something wrong to jeopardize that, where [he] would be terminated if [he] stole, or something like that." Mr. Yeager testified: "I considered that a promise when—if you didn't get out of line and did your job."

employment under which they must be retained until they retired or violated their employment contract by misconduct or failure to perform their duties. Yeager categorically testified that, at the time he was hired, management promised him and continued to assure him that he was entitled to "lifetime employment." Harrah's promised him that he would be employed until he retired or "unless [he] did something wrong to jeopardize that." (*See* footnote 2.) The contract is well-established by Yeager's testimony; all that is missing is *corroboration*. Yeager (unaware that this court was going to issue this strange ruling) did not offer any corroborative evidence during the summary judgment proceedings. Although Yeager could establish any other kind of contract with Harrah's without corroboration, his employment contract cannot be sustained under our present ruling solely because he did not present corroborative evidence during the summary judgment proceedings.

Nevada now becomes the only state in the nation that puts this burden on its employees. The majority concedes that this court is indeed "imposing special restrictions on an employee" who is asserting contractual rights against an employer but maintains that such "restrictions" are necessary in order to limit the employee's "unfettered right to sue." Under today's ruling workers' rights to sue are very much *fettered* by a newly-invented "restriction" that is not imposed on other contract claimants in civil contract suits. Workers have a new burden that other litigants do not have to carry. Workers who sue their employers in job-related matters are faced with a new "restriction" on their right to sue. Workers must bring with them to court something that other claimants need not bring; they must come equipped with some *additional* proof to show that they are not lying. If they do not or cannot provide this additional proof, they are thrown out of court, as is Mr. Yeager today.[3]

---

[3]JUSTICE ROSE makes the suggestion that Vancheri v. GNLV Corp., 105 Nev. 417, 777 P.2d 366 (1989), provides authority for the novel proposition that an employee cannot sue his employer on a contract of employment unless the employee can provide corroboration to support his or her testimony concerning the existence of an employment contract. There is, of course, nothing in *Vancheri* that is inconsistent with the position that I take in this dissent. The plaintiff in *Vancheri* did not even come close to establishing a contract of employment. Mr. Vancheri was trying to rely on gratuitous statements by his employer that he was welcome "to the family" and that "he would have a great future" with the company. *Id.* at 421, 777 P.2d at 369. Mr. Vancheri offered no proof, as in the case now before us, of an actual agreement between his employer and him; rather, his claim was merely that he had relied on the mentioned remarks by his employer in deciding to take up a new job with the GNLV "family." This court quite properly and unanimously held that Mr. Vancheri's subjective reliance or "'understanding' that the employment was for a fixed period" was insufficient to support a

Naturally, the majority provides us with no case authority[4] for the proposition that employees should have a restricted or "fettered" right to sue on their employment contracts. Harrah's itself did not attempt to argue to the court such an outlandish proposition, and the novel doctrine promulgated by the majority in this case was conjured by the court, acting on its own. I do not have any idea where this "corroboration" doctrine might have come from; but it seems clear to me that it gives undue advantage to employers and treats employees in an unfair and discriminatory way. I could not possibly join in such a ruling; therefore, I respectfully dissent.

---

contract. "Contracts of employment cannot be created by the subjective expectations of an employee." *Id.* (citations omitted). The court noted in *Vancheri* that absent "independent evidence" of the "terms of an employment contract," Mr. Vancheri's contractual claims must be dismissed. *Id.* I do not see how "independent evidence indicating the terms of an employment contract" can mean anything other than evidence of an offer and acceptance, evidence of an exchange of promises, or evidence that somehow established that there was an actual agreement between the parties rather than merely a unilateral, subjective understanding on the part of only one of the supposed contractors. The quoted language most certainly neither states nor implies that employees are not competent to enforce their contracts of employment unless they are able to support their sworn testimony with corroborative evidence. That the majority should rely on *Vancheri* as authority for the proposition that employees must provide corroboration in all employment contract cases severely diminishes the credibility of the majority opinion and has the effect of further weakening rather than strengthening the unique and unfortunate holding today embraced by JUSTICE ROSE and a majority of this court.

[4] The majority cites no case in which an employee's sworn narration of circumstances evidencing an employment contract must be rejected unless the employee can furnish corroboration to support his or her sworn testimony. The majority cites only cases in which indefinite oral statements by employers were properly held to be insufficient to support the formation of a contract which would overcome the at-will presumption. For example, I have no quarrel with the proposition that "general assurances of an ongoing working relationship are not sufficiently definite so as to rebut the at-will presumption." Evans v. GTE Health Systems, Inc., 857 P.2d 974, 977 (Utah Ct. App. 1993), *aff'd*, 878 P.2d 1153 (Utah 1994). As I have stated in the previous note, I have no quarrel with *Vancheri*-type rulings in which it is held that mere, unilateral assurance will not support a contract of continued employment. These kinds of cases are far removed from the case at hand. Here the only thing that prevents Mr. Yeager from prevailing in his contract action is his innocent failure to present corroborative evidence during the summary judgment proceedings.